FILED
2025 Feb-26  PM 12:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| GROVES ENTERPRISES, INC., | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | Case No.:  2:23-cv-00340-RDP |
| | } | |
| AFC FRANCHISING, LLC, | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This matter is before the court on Plaintiff Groves Enterprises, Inc.'s ("Groves") Motion for Partial Summary Judgment (Doc. # 34) and Defendant AFC Franchising, LLC's ("AFCF") Motion for Summary Judgment. (Doc. # 37). The Motions have been fully briefed (Docs. # 34, 35, 38, 41, 42, 43; 36, 37, 39, 40, 44). After careful review, and for the reasons outlined below, Groves's Motion for Partial Summary Judgment (Doc. # 34) is due to be granted, and AFCF's Motion for Summary Judgment (Doc. # 37) is due to be denied.

## I.    Background

This is a breach of contract case. Groves and AFCF entered into a Master Development Agreement (the "MDA"), which Groves now alleges AFCF wrongfully terminated after Groves sought to exercise its option to renew the MDA.

On June 6, 2024, the parties convened for a telephone conference with the court to discuss a discovery dispute. (Doc. # 29). Following the telephone conference, the court ordered the parties to limit discovery to the issue of the interpretation of Section 1.1(a) of the MDA. (*Id.*). The court limited discovery to this issue because the interpretation of Section 1.1(a) could be dispositive to the remaining issues in this case.

The facts set out by the court are gleaned from the parties' submissions and the court's own examination of the Rule 56 record. These are the "facts" for summary judgment purposes only. They may not be the facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

On March 30, 2009, Groves, as master developer, and Doctors Express Franchising, LLC ("Doctors Express"), as franchisor, entered into the MDA involving urgent care centers. (Docs. # 23 ¶ 10; 35-1). The MDA has a fifteen-year term limit. (Doc. # 35-1 at 10). Thus, absent any earlier termination, the MDA would have expired on March 30, 2024. (*Id.*). Under the MDA,[1] Doctors Express granted master development rights to Groves, including the following rights:

> (1) [to] develop, open and operate Doctors Express Urgent Care Businesses in a mutually-agreed geographic area identified in Exhibit A (the "Territory"); (2) assist us with the sale of franchises (the "Franchises") to third parties (the "Franchisees") who will operate Doctors Express Urgent Care Businesses and/or manage Doctors Express Urgent Care Centers in the Territory; and (3) perform certain initial and ongoing support and assistance functions for (collectively, the "Servicing Responsibilities") and monitor the performance of (collectively, the "Monitoring Responsibilities") Franchisees in the Territory (collectively, the "Master Developer Rights").

(Doc. # 35-1 at 6).

Groves's "Territory" under the MDA is defined as "Master Territory # 15 Charlotte, Asheville and Greenville,[2] NC Master Development Area." (*Id.* at 36).

Section 1.1(a), which is at issue here, involves Groves's obligations under the MDA. (*Id.* at 7). It reads as follows:

1.     **GRANT OF RIGHTS**

1.1     Your Rights.

---

[1] The MDA designates Doctors Express as "we," "us," or "our," and Groves as "you" and "your." (Doc. # 35-1 at 6).

[2] It is undisputed that the reference to "Greenville" in the MDA is directed to Greenville, South Carolina. (Doc. # 37 at 2 n.2).

> Subject to the terms and conditions of this Agreement, we grant you and you accept the Master Developer Rights and you will operate a master developer business (the "Master Developer Business") in the Territory. You hereby undertake the following obligations during the term in the Territory:
>
> (a)     You may seek one or more sites for franchised Doctors Express Urgent Care Businesses to be operated at sites we approve within the Territory. Each franchised Doctors Express Urgent Care Business must be developed and operated pursuant to our then-current Doctors Express Franchising, LLC franchise agreement which you (or an affiliated entity) must sign as and when required by us. You must develop and have open and in operation at least one franchised Doctors Express Urgent Care Business in the Territory, pursuant to a Franchise Agreement executed with us, by no later than three hundred sixty five (365) days following execution of this Agreement.

(*Id.*).

Groves opened its first franchised Doctors Express urgent care center ("Center") in the MDA Territory in Greenville, South Carolina in October 2010. (Doc. # 35-5 at 3 ¶ 7). Although the opening of this Center was outside of the 365-day timeframe provided for in Section 1.1(a) of the MDA, Doctors Express waived any challenge to the delay. (*Id.*).

In or around April 2013, pursuant to an asset acquisition with Doctors Express, the MDA was assigned to AFCF, which made AFCF the franchisor for the then-existing franchise agreements. (Docs. # 23 ¶ 11; 35-3 at 9-10). As a result, all of the franchisor's rights and obligations under the MDA were assigned to AFCF. (Doc. # 35-3 at 9-10).

By summer 2022, Groves had developed and opened a total of fifteen franchised Centers in the Territory and was in the process of developing three additional Centers. (Doc. # 35-5 at 4 ¶ 10). Groves, through its affiliates, was operating seven of the fifteen open Centers. (*Id.*). Around that same time, Groves had obtained AFCF's approval to pursue the sale of ten Centers in the Territory that Groves was either operating or in the process of developing. (*Id.* at 4 ¶ 11). On or around February 28, 2023, Groves and its affiliates sold those ten Centers to Bon Secours. (*Id.* at 5 ¶ 14). It did so with the approval of AFCF. (*Id.*).

As of late 2022 and into early 2023, the fifteen Centers that Groves had developed and opened (or arranged to open) in the Territory since 2009 were still in operation in the Territory. (Doc. # 35-5 at 5 ¶ 15). However, after the February 28, 2023 sale to Bon Secours, Groves and its affiliates no longer owned or operated any Centers in the Territory. (*Id.* at 5 ¶ 15; Doc. # 36-2 at 11).

On June 29, 2023, Groves received a letter from AFCF notifying Groves that "[p]ursuant to Section 1 of the [MDA], [it] was in default for not having a location in operation." (Doc. # 35-7 at 2). The communication from AFCF continued: "We are giving you sixty (60) days pursuant to Section 4(d) of Addendum 1 of the [MDA] to cure your default or we may terminate your [MDA]." (*Id.*). But, the two ships (Groves and AFCF) were passing in the night.

On July 5, 2023, Groves sent a Notice of Intent to Renew, providing AFCF "notice of [Groves's] election to renew its master developer business and request a successor master developer agreement for a first five-year renewal/successor term, as provided for in Section 2.2 and 2.3 of the MDA." (Doc. # 35-6 at 3). Section 2.1 of the MDA outlines the MDA's initial term limit of fifteen years. (Doc. # 35-1 at 10). In turn, Section 2.2 provides Groves's "Right to a Successor Agreement." (*Id.*) Section 2.2 states in relevant part:

> If you meet certain conditions, then you will have the option to request the right to operate the Master Developer Business for four (4) successor terms. Each of the four successor terms will be five (5) years, for a total of twenty (20) years. The qualifications and conditions for the first successor term are described below. . . .
>
> When this Agreement expires:
>
> (a)    if you (and each of your owners) have substantially complied with this Agreement during its term; and
>
> (b)    if you (and all of your owners) are, both on the date you give us written notice of your election to request a successor master developer agreement (as provided in Section 2.3 below) . . . in full compliance with this Agreement, . . .

then you have the option to execute a successor master developer agreement for a term of five (5) years commencing immediately upon the expiration of this Agreement . . . .

. . .

If you (and each of your owners) are not, both on the date you give us written notice of your election to request a successor master developer agreement and on the date on which the term of the successor master developer agreement commences, in full compliance with this Agreement, other agreements with us, our affiliates, and your suppliers, and all System Standards, you acknowledge that we need not grant you a successor master developer agreement, whether or not we had, or chose to exercise the right to terminate this Agreement during its term under Section 16.1.

(*Id.*). Section 2.3 outlines how Groves must give notice if it exercises its option to request a

successor master developer agreement. (*Id.* at 11-12). It also governs AFCF's obligations after

Groves has given such notice:

We agree to give you written notice ("Our Notice"), not more than ninety (90) days after we receive your notice, of our decision:

(a)      to grant you a successor master developer agreement;

(b)      to grant you a successor master developer agreement on the condition that you correct existing deficiencies of your Master Developer Business and/or satisfy our then current qualifications, certification, and training requirements; or

(c)      not to grant you a successor master developer agreement based on our determination that you and your owners have not substantially complied with this Agreement, other agreements with us, our affiliates, and your suppliers during its term or were not in full compliance with this Agreement and all System Standards on the date you gave us written notice of your election to request a master developer agreement.

(*Id.* at 11).

Following Groves's July 5, 2023 letter, on September 28, 2023, AFCF sent Groves a letter

acknowledging receipt of Groves's notice of intent to renew, and notifying Groves that:

in accordance with § 2.3(c) of the MDA, AFCF elects not to grant you a successor MDA based on our determination that you and your owners have not substantially complied with the MDA on the date you gave us written notice of your election to request a successor MDA as outlined in our notice of default dated June, 29, 2023 ("Notice of Default"). In addition, this correspondence will serve as AFCF's notice

of termination of the MDA for failure to timely cure the default identified in the
Notice of Default.

(Docs. # 23 ¶ 67; 35-8 at 2).

Groves filed its initial Complaint against AFCF on March 17, 2023 (Doc. # 1) and filed its

Amended Complaint on November 7, 2023, asserting two claims: Count One – Breach of MDA

(for Wrongful Termination of MDA Prior to End of Initial Term); and Count Two – Breach of

MDA (for Wrongful Refusal to Grant Successor Master Developer Agreement). (Doc. # 23 ¶¶ 74-

89).

## II.      Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking

for summary judgment always bears the initial responsibility of informing the court of the basis

for its motion and identifying those portions of the pleadings or filings which it believes

demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has

met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate

specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts

and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub.*

*Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d

1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (internal quotation marks omitted). "Upon making this showing, the burden shifts to the non-moving party, who must produce 'significant, probative evidence demonstrating the existence of a triable issue of fact' to avoid summary judgment." *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1317 (11th Cir. 2024) (quoting *Four Parcels of Real Prop.*, 941 F.2d at 1438). That is, the moving party must demonstrate that, on all the essential elements on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party. *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, "come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Four Parcels of Real Prop.*, 941 F.2d at 1438 (alteration in original) (quoting *Chanel, Inc.*, 931 F.2d at 1477); *see also* Fed. R. Civ. P. 56(e).

Although there are cross motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the United States*, 224 F.2d 338, 345 (5th Cir. 1955);[3] *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently, and in accordance with the Rule 56 standard. *Matter of Lanting*, 198

---

[3] The Eleventh Circuit recognizes that Fifth Circuit decisions rendered prior to the close of business on September 30, 1981 are binding precedent. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

B.R. at 820. "The fact that both parties simultaneously are arguing that there is no genuine issue

of fact, however, does not establish that a trial is unnecessary thereby empowering the court to

enter judgment as it sees fit." Wright, Miller & Kane, Federal Practice and Procedure § 2720, at

327-28 (3d ed. 1998).

### III.   Discussion

The parties' MDA contains a choice-of-law clause that specifies Maryland law governs

any contract disputes. (*See* Doc. #35-1 at 30). Neither party disputes that Maryland law applies

under this choice-of-law provision (*see* Docs. # 37 at 5; 38 at 17); so, the court applies that state's

law to Groves's breach of contract claim.

Under Maryland law, to prevail in an action for breach of contract, a plaintiff must prove

that the defendant owed the plaintiff a contractual obligation and that the defendant breached that

obligation. *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (2001). Here, the parties do not dispute

that the MDA was an enforceable, binding contract between the parties. The dispute centers on the

second element – whether AFCF breached the MDA as alleged. Groves contends that AFCF

breached the MDA by wrongfully terminating it and wrongfully refusing to grant Groves a

successor MDA. (Doc. # 23 at 19). On the other hand, AFCF argues that it did not breach the MDA

because Groves was in default under Section 1.1(a) of the MDA. (Doc. # 37). The key to resolving

the parties' dispute is the proper interpretation of Section 1.1(a).

When construing a contract, Maryland courts "subscribe to the objective theory of contract

interpretation," *Credible Behavioral Health, Inc. v. Johnson*, 220 A.3d 303, 310 (2019) (citing

*Myers v. Kayhoe*, 892 A.2d 520, 526 (2006)). This theory provides:

> [A court must] determine from the language of the agreement itself what a
> reasonable person in the position of the parties would have meant at the time it was
> effectuated. In addition, when the language of the contract is plain and
> unambiguous there is no room for construction, and a court must presume that the

parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean.

*Spacesaver Systems, Inc. v. Adam*, 98 A.3d 264, 268-69 (2014) (quoting *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (1985)). Further, "when the contractual language is clear and unambiguous, [] in the absence of fraud, duress, or mistake, parol evidence is not admissible to show the intention of the parties or to vary, alter, or contradict the terms of that contract." *Gen. Motors Acceptance Corp.*, 492 A.2d at 1310.

Both Groves and AFCF argue that Section 1.1(a)'s language is unambiguous. The court agrees, and thus confines its review to the contract language itself. Section 1.1(a) states in relevant part:

**1.    GRANT OF RIGHTS**

1.1    Your Rights.

Subject to the terms and conditions of this Agreement, we grant you and you accept the Master Developer Rights and you will operate a master developer business (the "Master Developer Business") in the Territory. You hereby undertake the following obligations during the term in the Territory:

(a)    You may seek one or more sites for franchised Doctors Express Urgent Care Businesses to be operated at sites we approve within the Territory. Each franchised Doctors Express Urgent Care Business must be developed and operated pursuant to our then-current Doctors Express Franchising, LLC franchise agreement which you (or an affiliated entity) must sign as and when required by us. **You must develop and have open and in operation at least one franchised Doctors Express Urgent Care Business in the Territory, pursuant to a Franchise Agreement executed with us, by no later than three hundred sixty five (365) days following execution of this Agreement.**

(Doc. # 35-1 at 7) (emphasis added). The parties contest the meaning of the last sentence in Section 1.1(a).

Pursuant to the plain and unambiguous language of Section 1.1(a), Groves had an obligation to "develop and have open and in operation at least one franchised [AFCF] Urgent Care

9

Business in the Territory, pursuant to a Franchise Agreement executed with [AFCF], **by no later than three hundred sixty five (365) days following execution of this Agreement**.” (*Id.*) (emphasis added). Groves complied with this obligation. Groves opened its first franchised Center in the MDA Territory in Greenville, South Carolina in October 2010. (Doc. # 35-5 at 3 ¶ 7). Although the opening of this Center was outside of the 365-day timeframe provided for in Section 1.1(a) of the MDA, Doctors Express waived any objection to the delay. (*Id.*). To be sure, AFCF does not contend that Groves’s delay in opening its first Center provides any basis for default or terminating the MDA. (Doc. # 38 ¶ 15 (citing Doc. # 35-3 at 11, 25-26)). Rather, AFCF argues that:

> under the plain language of the MDA, Groves had a contractual obligation during the term of the MDA to “develop and have open and in operation at least one franchised [AFCF] Urgent Care Business in the Territory, pursuant to a Franchise Agreement executed by [AFCF], by no later than three hundred sixty five (365) days following execution of this Agreement.”

(Doc. # 37 at 8) (footnote omitted). AFCF further argues that because Groves had divested itself of all AFCF franchised locations in its Territory as of February 23, 2023, Groves was in default under Section 1.1(a). (*Id.*).

But, AFCF misreads Section 1.1(a)’s unambiguous language. This language merely provides that Groves had an obligation to “develop and have open” at least one Center, “by no later than [365] days following execution of [the MDA].” (Doc. # 37 at 8). Section 1.1(a) does not state, nor does it require, that Groves was obligated to develop *and* continuously have open one Center for the entire fifteen-year term of the MDA. The section only states that Groves must have a franchise open and in operation within 365 days after the execution of the MDA, which it did (as any rights triggered by its delay were waived). (Doc. # 35-5 at 3 ¶ 7). While AFCF desires to read into the contract that Groves was under a continuing obligation to operate a Center for the length of the MDA’s term, this is not what Section 1.1(a) says.

10

Therefore, based on the plain language of Section 1.1(a), the court finds that Groves was not in default of its obligations under Section 1.1(a) of the MDA.

## IV.     Conclusion

For the reasons discussed above, Groves's Motion for Partial Summary Judgment (Doc. # 38) is due to be granted and AFCF's Motion for Summary Judgment (Doc. # 38) is due to be denied. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this February 26, 2025.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE